**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES LOCATED AT 52 SABATTUS STREET, APT 3R, LEWISTON, ME, 04240, PERSON OF STEVEN W. BRAGDON, AND 2016 CHEVROLET TRAVERSE WITH VIN: 1GNKVFKD3GJ238532 | No. 2:26-MJ-00294-KFW<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Jose G. Rodriguez-Aguilar, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since June 2022. I am currently assigned to the Boston Division, Portland Resident Agency, of the FBI. As part of my duties, I investigate crimes involving the sexual exploitation of minors, including the production, possession, and distribution of child pornography. I received training on the proper investigative techniques for these violations, including the use of surveillance techniques, undercover activities, and the application and execution of arrest and search warrants.

2. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing searches of the following:

- the person of Steven W. BRAGDON, DOB XX/XX/1984 (hereinafter, the "Subject Person"), including any digital devices found on the Subject Person, such as a cellphone;

- the property located at 52 Sabattus Street, Apt 3R (labeled with a number 6 on the door), Lewiston, ME 04240, to include outbuildings or separate storage areas (hereinafter, the "Subject Premises"); and

- a 2016 Dark Blue Chevrolet Traverse, VIN: 1GNKVFKD3GJ238532, registered to BRAGDON in the state of Maine with an active Maine license plate of "525BES" (hereinafter, the "Subject Vehicle").

as well as any computer, computer equipment, computer storage media, and other electronic or digital media capable of storing or transmitting digital data or digital media (including cell phones, laptops, desktop computers, internal and external hard drives, flash drives, and CD/DVDs) that are located during any of those searches, as more fully described in Attachment A. Located within the places and items to be searched, I seek to seize evidence, fruits, and instrumentalities relating to violations of Title 18, United States Code, Sections 2252A(a)(5)(B) and (b)(2) (possession of/access with intent to view child pornography) (collectively, the "Target Offense"), as more fully described in Attachment B.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses. Because this affidavit is being submitted for the limited purpose of

securing a search warrant, I have not included each and every fact known to me nor other law enforcement agents concerning this investigation.

4. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 2252A(a)(5)(B) and (b)(2) (possession of/access with intent to view child pornography) (collectively, the "Target Offenses"), have been committed by Steven BRAGDON. There is also probable cause to search the places described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of this crime further described in Attachment B. The applied-for warrant would authorize the search of the Subject Premises, Subject Person, and Subject Vehicle, and the seizure of records and information that constitute fruits, contraband, evidence, and instrumentalities of violations of Title 18, United States Code, Sections 2252A(a)(5)(B) and (b)(2) (possession of/access with intent to view child pornography), those violations involving Steven BRAGDON and occurring on or between March 1, 2025 and the present (the "Target Offenses"), as further described in Attachment B.

**TARGET OFFENSES**

5. As noted above, this investigation concerns an alleged violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2), which prohibits a person from knowingly possessing or knowingly accessing with intent to view any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or

affecting interstate or foreign commerce by any means, including by computer, or attempting or conspiring to do so.

6. The term "child pornography" is defined in 18 U.S.C. § 2256(8). "Child pornography," as defined in 18 U.S.C. § 2256(8), includes: any visual depiction of a minor under the age of 18 years engaging in sexually explicit conduct. "Sexually explicit conduct" is defined in 18 U.S.C. § 2256(2) and includes actual or simulated sexual intercourse, whether genital-genital, oral-genital, anal-genital, or oral-anal, whether between members of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or the lascivious exhibition of the genitals, anus, or pubic area of any person. For investigative purposes, child pornography is commonly referred to as child sexual abuse material or CSAM. For purpose of this affidavit, the terms CSAM, child sexual abuse material, and child pornography will be used interchangeably.

## SUMMARY CONCERNING CHILD PORNOGRAPHY, PERSONS WHO POSSESS AND COLLECT CHILD PORNOGRAPHY, AND HOW USE OF COMPUTERS AND THE INTERNET RELATES TO THE POSSESSION, RECEIPT, AND DISTRIBUTION OF CHILD PORNOGRAPHY

7. Based on my experience in child exploitation investigations and upon information provided to me by other law enforcement officers, I am aware that the following characteristics are common to individuals involved in child pornography offenses:

a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b. Such individuals may collect sexually explicit or suggestive materials, in a variety of media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child, or to demonstrate the desired sexual acts.

c. This type of material often includes what may be termed as child erotica or child exploitation material, which may consist of images or videos such as minors in lingerie or text writing involving sex with minors that do not rise to the level of CSAM, but nonetheless fuel their deviant sexual fantasies involving minors. I am aware that this sort of material has been admitted in trials under Fed.R.Evid. 404(b) to prove such things as the possessor's knowledge, intent, motive, and identity to prove the person has a sexual interest in minors. I understand that they may upload or import (meaning transfer) this illicit imagery, including CSAM, onto multiple digital media devices and/or accounts so they can access such material readily to satisfy their prurient desires.

d. Such individuals may possess and maintain their copies of child pornographic material, that is, their pictures, films, videos, magazines, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain their pictures, films, video tapes, photographs, magazines,

photographs, correspondence, mailing lists, books, tape recordings, and child erotica, etc. for many years.

e. Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer or cellphone, and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, or in online storage, email accounts or other online communication accounts, to enable the individual to view the collection, which is valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

f. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[1]

[1] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774, 778 (7th Cir. 2012) (collecting cases, *e.g.*, *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); and *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)); *United States v. Morales–Aldahondo*, 524 F.3d 115, 119 (1st Cir.2008) (holding that a three-year lapse between the defendant's purchase of child pornography and the warrant application did not render the information stale because a special agent attested that those who download child pornography tend to retain images for years and use computers to augment and store collected images).

g. Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/collectors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses (including email addresses), and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

h. Individuals who would have knowledge on how to distribute and receive digital images of child pornography through the use of Peer-to-Peer networks and other online methods would have gained knowledge of its location through online communication with others with similar interests. Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images. Individuals who utilize these types of forums may be considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

i. Based on my training and experience, I know that such individuals may use their financial information to buy and sell child pornography online and purchase software used to make their online activity from law enforcement. For instance, individuals may purchase cryptocurrency such as Bitcoin to buy and sell child pornography online. The use of cryptocurrency provides a level of anonymity because it masks the user's identity when conducting online financial transactions and provides a means of laundering illicit proceeds. Financial information may provide a

window into the identities of individuals seeking to buy or sell child pornography online by tying the illicit transactions back to the user. Financial information contained on an electronic device containing child pornography may also provide indicia of ownership. Further, based on my training and experience, I know individuals involved in the trafficking of child pornography may use sophisticated software, such as router configuration software, virtual private networks, proxy servers, cryptocurrency exchanges, or other anonymizing software, in conjunction with these illicit financial transactions to provide dual layers of anonymity and prevent law enforcement detection. Financial information may indicate which services were purchased to obscure an individual's identity.

j. Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been consistently documented by law enforcement officers involved in the investigation of child pornography throughout the world.

8. Based on my investigative experience related to computer and internet related child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned the following:

a. Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. It has also revolutionized the way in which child pornography collectors interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop

and reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To distribute these on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contact, mailings, and telephone calls. Any reimbursement would follow these same paths.

b. The development of computers, smartphones and the internet have added to the methods used by child pornography collectors to interact with and sexually exploit children. Computers, smartphones, and the internet serve four functions in connection with child pornography. These are production, communication, distribution, and storage.

c. Smartphones have the capability to access the Internet and store information, such as videos and images. As a result, an individual using a smartphone can send, receive, and store files, including child pornography, without accessing a personal computer or laptop. An individual using a smartphone can also easily plug the device into a computer (via a USB cable) or connect with a computer via Bluetooth, and transfer data files from one digital device to another. Some smartphone users can and do create, communicate, upload, and download child pornography, and communicate with children to coerce them or entice them to produce child pornography or perform sexual acts, by using internet based social media or electronic service providers like Instagram, Snapchat, or Apple (and many others).

d. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer – can store thousands of images or videos at very high resolution. It is easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

e. Child pornography can be transferred via electronic mail or through file transfer protocols ("FTP") to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), easy access to the Internet, and online file sharing and storage, the computer is a preferred method of distribution and receipt of child pornographic materials.

f. Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud"

storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (i.e., by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

h. In my recent investigative experience, as well as recent discussions with law enforcement officers, I know that individuals who collect child pornography are using email accounts, online storage accounts, and other online communications accounts to obtain, store, maintain, and trade child pornography with growing frequency, in addition to, or as an alternative to, the use of personal devices.

i. Based on traits shared by collectors, the use of email, online storage accounts, and other online communication accounts, and the increased storage capacity of computers and server space over time, there exists a

fair probability that evidence regarding the possession of child pornography will be found in the Subject Premises, Subject Vehicle and/or on the Subject Person notwithstanding the passage of time.

j. In addition, computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools.

**NCMEC CYBER TIPLINE**

9. The National Center for Missing and Exploited Children ("NCMEC") receives complaints via their Cyber Tipline from Internet Service Providers (ISPs), Electronic Service Providers (ESPs), and others. U.S. ESPs are required by U.S. federal law to report "apparent child pornography" to NCMEC via the Cyber Tipline (18 U.S.C. § 2258A) if they become aware of the content on their servers. Leads are reviewed by specially trained analysts, who examine and evaluate the reported content, add related information that may be useful to law enforcement, use publicly available search tools to determine the geographic location of the apparent criminal act, and ultimately provide all of the gathered information to the appropriate law enforcement agency for review and possible investigation.

10. The Cyber Tipline receives reports on the following type of criminal conduct: possession, manufacture and distribution of child pornography; online enticement of children for sexual acts; child prostitution; sex tourism involving

children; child sexual molestation; unsolicited obscene material sent to a child; misleading domain names; and misleading words or digital images on the Internet.

11. The Cyber Tipline reports will vary in detail depending on the nature of the report, and which entity submits it. However, the reports will include any known information (1) relating to the identity of any individual who appears to have violated federal law by committing or attempting to commit the criminal conduct described above; (2) historical information on when or how a customer or subscriber of an ECS or RCS uploaded, transmitted, or received apparent child pornography; (3) geographical information on the involved individual or website, which may include the IP Address or verified billing address or geographic identifying information, including area code or zip code; (4) any images of apparent child pornography; and (5) the complete communication containing any image of apparent child pornography. See 18 U.S.C. § 2258A(b). Cyber Tipline reports can be supplemented and made in connection with other Cyber Tipline reports.

## CASH APP

12. Block Inc. ("Block") provides a money transmission product for non-commercial and commercial use known as Cash App. A Cash App account allows an individual to conduct electronic money transfers, funded by a linked debit card, bank account, credit card, physical cash or stored balance to other individuals and businesses. Cash App users may also use funds to purchase or sell Bitcoin ("BTC") and transact with other Cash App users peer-to-peer, or with external users via transactions on the blockchain or via the Lightning Network ("LN"), which is a second layer technology for faster BTC transactions.

## THE TOR NETWORK

13. The DARK WEBSITE-1, further described below, operated on the Tor network, which is a computer network designed to facilitate anonymous Internet communication by routing communications through a globally distributed network of relay computers operated by volunteers. A user may access the Tor network via any computer or electronic device that has been configured to use Tor routing/software, to include computers, smartphones, or tablets. The most common method is to use the Tor web browser, which is preconfigured to access the network. The contents of a Tor user's communications are encrypted while the communication passes through the Tor network. Nevertheless, when a Tor user visits a website and requests content from the website server, the website server can still reliably transmit the requested content to the Tor user's computer. Because of the way the Tor network routes communications through relay computers, traditional online investigative techniques are generally not effective.

14. Tor may be used to access open-Internet websites like www.justice.gov and to operate or access websites called "hidden services" or "onion services" that are accessible only to Tor users. Like other websites, hidden services are hosted on computer servers that communicate through IP addresses. However, hidden services have unique technical features that attempt to conceal the computer server's location.

15. A Tor web address is generally comprised of a series of 56 algorithm-generated characters, i.e., "asdlk8fs9dflku7fasdlk8fs9dflku7fasdlk8fs9dflku7fasdlk8fs," followed by the suffix ".onion." Unlike ordinary websites, there is no publicly available Domain Network Service "DNS" listing through which one can query the IP address of a Tor hidden service. So, while law enforcement agents can often view and access hidden

services that are facilitating illegal activity, they cannot determine the IP address of a Tor hidden service computer server via public lookups.

**PROBABLE CAUSE**

16. On or about July 17, 2026, Block filed Cyber Tipline Report #250737400 with NCMEC regarding a transaction made by a Cash App account that appeared to be for the purchase of child pornography. According to the report, on or about January 10, 2026, at 13:15:51 UTC, Cash App user "Stevenkickass" (C_g4exa8mpj), later identified as Steven BRAGDON, used his Cash App account to successfully conduct a BTC transfer withdrawal in the amount of 0.00020973 BTC, plus a fee, which is approximately $19 to benefit BTC wallet address "bc1qzv4jvwx75zlywkn5y45myu0jnyxl3rqzz6yrz5." As documented in the report and further set below, the BTC wallet ending in "6yrz5" was determined to be in a cluster of wallets[2] owned by a known CSAM vendor hosted on the dark web ("DARK WEBSITE-1").[3]

17. The subject information provided by Block for BRAGDON in the Cyber Tipline report was as follows:

> Name: Steven Bragdon
> Address: 52 SABATTUS ST APT 3R
> LEWISTON, ME 04240 US

---

[2] A cluster is a group of cryptocurrency wallets which have been identified as belonging to the same individual or entity. A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses and types of virtual currency at the same time. There are various types of virtual currency wallets, including software wallets, hardware wallets, and paper wallets. The virtual currency wallets at issue for the purposes of this affidavit are software wallets (i.e., a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys).

[3] The name of DARK WEBSITE-1 as well as certain details regarding the websites and their users, are known to law enforcement but are not included here to protect operational security. Users of the DARK WEBSITE-1 and similar websites are often highly conscious of security and law enforcement activity. If the users of the DARK WEBSITE-1 learned of the investigative activity set forth in this affidavit, they could take steps to jeopardize the broader investigation, including by destroying evidence, changing patterns of behavior, alerting co-conspirators, and fleeing from law enforcement.

Date of Birth: XX-XX-1984
Email Address: toll.jethro@yahoo.com
Screen/User Name: Stevenkickass
ESP User ID: C_g4exa8mpj

18. On or about July 22, 2026, pursuant to legal process submitted by the FBI, Block provided records associated with BRAGDON's Cash App account. These records included BRAGDON's full name, date of birth, and full social security number. Based on my knowledge and information provided by Cash App, I know that Cash App only provides date of birth and social security numbers for an account if that account has met Cash App's internal thresholds for identity verification.[4] Therefore, I know BRAGDON is a verified Cash App user. Further, the records provided by Block included back and front photos of BRAGDON's Maine driver's license and a selfie-type photo of BRAGDON. BRAGDON's Maine driver's license confirmed his address as the Subject Premises and his date of birth. Within the information obtained from Block, BRAGDON's phone number linked to his Cash App account was observed to be XXX-XXX-4234 and email address was observed to be "toll.jethro@yahoo.com".

19. The records provided by Block to the FBI included a list of financial instruments associated to BRAGDON's Cash App account, which included credit and/or debit cards that were linked to a bank account from "Ancorum Credit Union," to include cards ending in 3947, 5704, 5339, and 0201. The records also showed the completed BTC transaction from BRAGDON's Cash App account to the BTC wallet of DARK

[4] To become a verified Cash App user, a user must provide his or her full legal name, date of birth, and the last four digits of his or her social security number. The user must then upload a clear photo of a government-issued ID, such as a driver's license or passport, and take a selfie-type photo for identity confirmation purposes. Cash App will then review a user's submission in order to make a final verification determination. If a user is verified, that user can spend from a Cash App balance, Cash App card, a linked bank account, or a linked debit card. If a user is unverified, that user can only spend from a linked debit card.

WEBSITE-1. The records included a list of devices BRAGDON used to access his account. Most of the devices were Android devices, to include a "moto g power (2021)," a "Galaxy A01", and an "Unknown Device." On or about January 17, 2026, BRAGDON used a "Browser," likely from a desktop or laptop computer, to access his Cash App account.

20. On or about August 2026, a Special Agent with the FBI's Virtual Currency Response Team conducted a review of BRAGDON's BTC transactions from his Cash App account. Through the date range of March 2025 through on or about July 07, 2026, Investigators located approximately 30 suspicious BTC transactions from BRAGDON's Cash App account to BTC wallets that were either flagged as belonging to a CSAM vendor or potentially flagged as related to a BTC wallet with overseas hosts that serve no legitimate purpose and are not traceable.

21. Of the transactions reviewed, the following transactions were found of payments from BRAGDON to known BTC wallets associated with DARK WEBSITE-1:

a. 01/10/2026 at 13:15:51 UTC, BRAGDON sent 0.00020973 BTC to wallet address ending in "6yrz5." Law enforcement tools associated this wallet address with DARK WEBSITE-1. The transaction hash for this transfer ends in "99bb0ee."

b. 01/24/2026 at 03:14:17 UTC, BRAGDON sent 0.00021216 BTC to wallet address ending in "j8t8f." Law enforcement tools associated this wallet address with DARK WEBSITE-1. The transaction hash for this transfer ends in "da79b6."

c. 02/09/2026 at 15:15:29 UTC, BRAGDON sent 0.00027409 BTC to wallet address ending in "tu2rpzp." Law enforcement tools associated this wallet

address with DARK WEBSITE-1. The transaction hash for this transfer ends in "98047f99."

d. 03/07/2026 at 00:12:09 UTC, BRAGDON sent 0.00027851 BTC to wallet address ending in "f2e6gw9." Law enforcement tools associated this wallet address with DARK WEBSITE-1. The transaction hash for this transfer ends in "26fb118b."

22. On or about August 2026, legal process was submitted to Ancorum Credit Union for account information related to any accounts that are owned by BRAGDON. In September 2026, Ancorum Credit Union provided records related to the request. Within the records received, I located BRAGDON's bank statements. Within the bank statements, the transactions show that BRAGDON was funding his Cash App account through his Ancorum Credit Union bank account ending in "5203."

23. During a review of the records provided by Block to the FBI, IP Address information was not available within the records for the date and time of the suspected transaction reported to the Cyber Tipline on January 10, 2026. Investigators located IP Address entries of "67.242.57.88" within BRAGDON's Cash App account for the dates of January 08, 2026 at 8:53:48 PM UTC and January 12, 2026 at 6:51:43 PM UTC. Legal process was submitted to Charter Communications and subsequently received in August 2026 for the above-mentioned IP Address for the above-mentioned dates and times. Within the records obtained from Charter Communications, the records yielded that the subscriber of the internet account using that specific IP Address was BRAGDON at the Subject Premises. The records from Charter Communications also yielded a phone number subscribed to BRAGDON of XXX-XXX-4234.

24. On or about August 2026, legal process was submitted to Google LLC for subscriber information for any account linked to the phone number ending in "4234." A return from Google LLC for the request yielded that email address "Bragdonsteven5@gmail.com" was linked to phone number ending in "4234" and last verified on 08/29/2026.

25. On or about September 2026, legal process served to Google LLC for subscriber information for the email address of "Bragdonsteven5@gmail.com". A return from Google LLC for the request yielded the following:

Name: "Steven kickass"
Created on: 11/16/2019
Last Login: 08/29/2026
Recovery Phone Number: XXX-XXX-4234
IP Logs resolve to Charter Communications
Google Pay: Steven William Bragdon, 52 Sabattus St. Apt 3R, Lewiston, ME (added 04/14/2025)
Device Attributed to Account: Samsung Chromebook 3

26. On or about July 2026, legal process was served to Yahoo Inc. for subscriber information related to Yahoo email address "toll.jethro@yahoo.com". The data return from Yahoo Inc. yielded that the account held a recovery phone number of XXX-XXX-4234. I am aware that phone number ending in "4234" belongs to BRAGDON.

27. During March 2026 and September 2026, an undercover FBI agent visited DARK WEBSITE-1 and confirmed that the site was active and that the site hosted predominately CSAM videos. Upon law enforcement visiting the DARK WEBSITE-1, the landing page of the website consisted of a disclaimer notification to the end user. The landing page consisted of a CSAM image presented with the following statement: "Welcome to DARK WEBSITE-1, DARK WEBSITE-1 is a video streaming platform

without any restrictions. This platform contains illicit sexual materials. If this is not what you are looking for, leave now! Please click continue to confirm." Once the end user selects to continue, the website prompts for a username and password. Towards the bottom of the login, the website states "Don't have an account? Sign up" and the "sign up" word contains a hyperlink to another webpage of the site where the end user is able to create a free account. Upon the end user creating an account and logging into the site, the DARK WEBSITE-1's homepage is similar to that of YouTube. The site contains thumbnails of videos that all appear to be CSAM. On the left-hand side of the site there is a menu that you can select different options such as "trending", "channels", "random video", "free videos", "bookmarked videos", and "#DARK WEBSITE-1 Chat." On the top of the site is a search bar, a notifications tab, and the end user's profile. Underneath the search bar, there is a row of menu items that consists of "videos", "categories", "chat", "upload", "wallet", "premium", and "join now."

28. A further review of DARK WEBSITE-1 yielded information that end users are able to make money off of videos that are posted onto the site. When the end user selects the menu tab for "wallet," the site informs the end user that they can earn $20.00 per 1000 views, and a status of their earnings account and "crypto balances."

29. When the end user selects on DARK WEBSITE-1 the "premium" tab, the site navigates to a landing page that is promoting DARK WEBSITE-1's premium account. The premium account advertises "unlimited downloads," "secure and private" downloads, "Priority access," and "No Download Limits." When selecting the payment method for a premium account, the end user is prompted to select from various payment methods that are exclusively crypto-based platforms, to include BTC, or the DARK WEBSITE-1's wallet belonging to the end user.

30. When the end user selects the menu tab of "join now," the site navigates to a landing page that displays different membership plans. A 7-day trial is advertised for $19, a monthly plan is advertised for $39, and a 3-month plan is advertised for $90. I am aware that the BTC transactions that BRAGDON conducted to the known BTC wallets of DARK WEBSITE-1 described in paragraph 21 of this affidavit, were all for similar amounts, approximately $19. Investigators observed that some of the videos within the site required a premium subscription in order to view the content.

31. During the September 2026 review of the DARK WEBSITE-1, Investigators located and observed CSAM content to include the following examples:

a. A video that is approximately 6 minutes and 07 seconds long, titled "preteen bath and blows dad." The video depicts a white female toddler who appears to be between the ages of 1 years old and 3 years old fully naked in a yellow bathtub while an adult white male sexually assaults her, to include vaginal and oral penetration.

b. A video that is approximately 15 seconds long, titled "hes teaching her." The video depicts a white minor female that appears to be under the age of 10, performing oral sex on an adult white male's erect penis while in a vehicle.

c. A video that is approximately 1 minute and 04 seconds long, titled "deep vaginal fuck with cumeshot." The video depicts a white minor female that appears to be under the age of 10, being vaginally penetrated by an adult white male's erect penis while laying on a bed.

***Background of BRAGDON*:**

32. A criminal history search of BRAGDON yielded: a 2014 conviction for possession of sexually explicit material of a minor under 12 and a 2016 conviction for visual sexual aggression against a child. The criminal history record further shows that BRAGDON violated his probation two separate times between 2016 and 2018 and also had his probation revoked during those times. BRAGDON is a current Maine tier-III lifetime registrant of the Maine Sex Offender Registry ("SORA"), with SORA #9374.

33. According to police reports, during the July 2013 investigation by the Maine State Police for BRAGDON that resulted in his conviction for possession of sexually explicit material of a minor under 12, investigators interviewed BRAGDON at his residence at the time in Waterville, Maine. During the interview, BRAGDON granted investigators access into his home. BRAGDON admitted to investigators at the time that he was looking at child pornography. At the time, BRAGDON was using several computers in the basement of his home. BRAGDON admitted to investigators that he was using software programs named "Ares" and "ICOhumt" to search for child pornography, in addition to using external hard drives to store data. At the time of the interview, BRAGDON admitted to investigators that he viewed and downloaded child pornography to his computer for the purpose of masturbating to the images.

34. According to police reports, during the July 2016 investigation of BRAGDON that resulted in his conviction for visual sexual aggression against a child, a mother reached out to Waterville Police Department complaining that BRAGDON had been contacting her 12-year-old daughter. The victim alleged that BRAGDON was contacting her on social media and engaging in sexually explicit conversations and sent

the victim a picture of his penis. BRAGDON was on probation at the time of this investigation.

***Identification of Subject Premises and Subject Vehicle:***

35. On or about September 01, 2026, law enforcement in the Lewiston, Maine area conducted a residence verification for BRAGDON to ensure that his residence matched the information BRAGDON provided the Lewiston Police Department during his sex offender registration. An officer of the Lewiston Police Department was able to confirm that BRAGDON still resides at 52 Sabattus Street, Apt 3R, Lewiston, Maine 04240 (Subject Premises).

36. On or about September 2026, physical surveillance was conducted at the Subject Premises and the known employment location of BRAGDON at 7 Rodman Road, Auburn, Maine 04210. Law enforcement observed the Subject Premises to be an approximate three-story building that appears to contain multiple residences within the building. The building that sits above what appears to be "Rancourt's Laundrymat" is marked 52 in black lettering on front of the laundrymat.

37. On the same date, law enforcement located BRAGDON's known dark blue 2016 Chevrolet Traverse vehicle (Subject Vehicle) at his employment in Auburn, Maine.

38. On September 23, 2026, law enforcement was voluntarily provided a key to gain physical access to the common area entry stairwell by the landlord of 52 Sabattus Street, Lewiston, Maine. On the same date, law enforcement conducted physical surveillance within the common area stairwell within the apartment building of 52 Sabattus Street. Upon review of the numbering of the apartment doors, law enforcement observed that the apartments were numbered 1, 2, 3, 4, 5 and 6 and there was no "3R". Law enforcement communicated with the landlord and the landlord confirmed that

BRAGDON resides within the apartment that is labeled "6". The landlord advised that the apartment on the 3rd floor that is labeled "6", is technically considered apartment "3R" and that BRAGDON lives there.

**SUMMARY**

39. Based on the facts detailed above, as well as my training and experience, BRAGDON appears to have a sexual interest in children and displays characteristics common to individuals who have a sexual interest in children and who possess and access child pornography. Based on these characteristics, and because the aforementioned Cash App account appears to have engaged in suspicious payments, including payments to known BTC wallets associated with DARK WEBSITE-1 and the account appears to be accessed, controlled, and/or created by BRAGDON and the Cash App account appears to have been accessed from devices at the Subject Premises, I respectfully submit there is probable cause that the Subject Premises, BRAGDON, the Subject Vehicle, and the electronic devices contained therein, contain evidence of possession of or access with intent to view child pornography.

**ELECTRONIC DEVICES AND FORENSIC ANALYSIS**

40. As described above and in Attachment B, this application seeks authorization to search for and seize records and information that might be found on the Subject Premises, BRAGDON, or the Subject Vehicle in whatever form they are found. One form in which the records and information might be found is data stored on an electronic device. Thus, the warrant applied for would authorize the search and seizure of electronic devices and the seizure or copying of electronically stored information, all under Rule 41(e)(2)(B).

41. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic devices and electronically stored information that reasonably could contain records and information described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may involve techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the medium to inspection to identify items that are seizable under the warrant.

42. In addition to the information provided above, I submit that there is probable cause to believe that records and information described in Attachment B are likely to be stored on electronic devices found on the Subject Premises, BRAGDON, and the Subject Vehicle and may be identified through forensic examination, for reasons including the following:

a. Based on my knowledge, training, and experience, I know that electronic files and information and remnants of files and information can be recovered months or even years after they have been stored on or deleted from an electronic device or viewed via the Internet. Information can be stored at little or no cost. Even when information has been deleted, it sometimes can be recovered months or years later using forensic tools. This is so because, typically, when a person "deletes" a file or information, the operating system may not immediately erase the data; instead, the system may instead remove the pointer or reference that links the file's location within the device's storage medium. Some or all of the deleted

data may then remain on the storage medium until it is overwritten by new data.

b. Additionally, in modern operating systems, a piece of information (e.g., text message, notification, photo, or location coordinates) may be written to several locations on the electronic device. When the primary item (e.g., a text message) is deleted, the other copies of the data may be unaffected and remain long after the deletion of the primary item.

c. In addition to user-generated files, electronic devices contain records that can help demonstrate how the device was used, what it was used for, and who has used it. Operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or page files can all be useful in answering such questions. Some of this information is routinely recorded by the operating system or by applications as part of a device's normal functioning. Electronic device users typically do not erase or delete this evidence, because specialized software is usually required for that task.

d. Additionally, most current operating systems (such as iOS, Android, and Microsoft Windows), as well as individual applications, routinely include features that utilize cloud services to synchronize data across multiple electronic devices linked to the same user account or service. These synchronization features—often enabled by default—can provide access to files, internet activity, photos, emails, text messages, and other forms of electronically stored information from any of the user's electronic devices. For example, when an iPhone user takes a photograph with their phone,

the photo can be nearly instantaneously synchronized across all their linked Apple devices (e.g., iPad, laptop, desktop) that are connected to the same Apple account. This synchronization functionality means that evidence within the parameters of Attachment B created on one device but subsequently deleted may still reside on other electronic devices if those devices have not yet received or processed the deletion signal or synchronized the update.

43. *Forensic evidence.* As further described in Attachment B, this application seeks permission to search for and to seize both records that serve more directly as evidence of the Target Offenses and forensic electronic evidence that establishes how electronic devices storing any such records were used, the purpose of their use, who used them, and when, as is relevant to the records described previously. Forensic electronic evidence also can help to identify and locate additional evidence of the Target Offenses. There is probable cause to believe that such forensic electronic evidence will be on electronic devices in the Subject Premises, BRAGDON, and the Subject Vehicle because:

a. Data on the electronic device can provide information about a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs, among others, store configuration information that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage

media, and the times the electronic device was in use. Electronic device file systems can sometimes record information about the dates files were created and the sequence in which they were created.

44. Additionally, some information stored on an electronic device may provide evidence relating to the physical location of other evidence or suspects. For example, an image stored on a device may have geolocation information incorporated into its file data. Such file data also may contain information indicating when the file or image was created. Information from such image files, along with external device connection logs, may also indicate the use of additional electronic storage media that may contain evidence of the Target Offenses (e.g., a digital camera or cellular phone with an incorporated camera).

45. Additionally, information stored on an electronic device may provide relevant insight into the device user's state of mind as it relates to the Target Offenses. For example, information on the electronic device may indicate the user's motive and intent to commit possession of child pornography (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence to conceal it from law enforcement).

46. As explained herein, based on my training and experience, I know that certain file types, artifacts, automatic processes, logs, and deleted information may require the use of additional forensic and contextual analysis to: (a) evaluate whether forensically recovered information falls within the relevant timeframe(s) or otherwise falls within the parameters of Attachment B and (b) identify and understand both inculpatory and exculpatory information on the electronic device.

47. Timestamps, compound files, and databases: I know through my training and experience and my communications with forensic experts that different electronic device operating systems and programs use multiple "timestamps" for information stored within devices. As further described below, these timestamps can be altered by automated processes. Because electronic devices employ timestamps to facilitate the functioning of the operating system or program, the timestamps for a particular file may present in idiosyncratic ways that require further analysis to understand. For example, operating system and application updates for electronic devices can change timestamps for information stored on the electronic device and can alter where information is stored on the device and the directories and databases associated with the information.

48. Also based on my training and experience and my communications with forensic experts, I know that electronic devices can contain databases and other compound files. A database or a compound file, such as a .rar or .zip file, will have timestamps for the container file, but also may contain many other files, data or logs, each with additional timestamps. I know that additional forensic and contextual analysis is often necessary to understand whether information contained in databases and compound files falls within the parameters of Attachment B.

49. Information for which no timestamps exist: Additionally, some information in current operating systems is often stored in formats that lack timestamps. For example, as discussed above, when information is deleted from an electronic device, current operating systems do not immediately erase the data. I understand that, depending on the operating system and electronic device, timestamps associated with deleted information may have changed or have been removed when that information was deleted. Advanced forensic tools and contextual investigation may help

analysts and investigators understand whether deleted information that is forensically recovered falls within the parameters of Attachment B.

50. User attribution information: In my training and experience, information stored on an electronic device (e.g., registry information, communications, images and videos, transactional information, records of session times and durations, internet history, anti-virus, spyware, and malware detection programs) can provide information about the use and control of the electronic device that is relevant to the Target Offense(s) and the authentication of evidence stored on the electronic device. This "user attribution" information can provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

51. User attribution evidence for electronic devices can be closely akin to evidence showing "indicia of occupancy" in the context of the execution of a residential search warrant. Information about the use or control of an electronic device can be highly relevant evidence in a criminal investigation.

52. Electronic device activity can indicate who used, owned, or controlled the device at times that are relevant to the Target Offenses. For example, as described herein, many electronic devices contain logs of user account session times and durations, device activity associated with user accounts, electronic storage media that connected with the device, and the IP addresses through which the electronic device accessed networks and the Internet. Such information can inform the chronological context of electronic device access, use, and events relating to the investigation of the Target Offenses. In addition to showing use and control of the electronic device, such

user-attribution information can be relevant to authenticating evidence obtained from the device. Similarly, the existence or absence of anti-virus, spyware, and malware detection programs may be used to explain the likelihood that the computer was remotely accessed, addressing claims of how a record got on the electronic device.

53. Some types of information that can be strongly indicative of use or control of an electronic device include:

a. Set up or registry information. I know in my training and experience that when users purchase or acquire an electronic device, as part of the device set up, the user will typically enter their name, a "recovery" email address, an associated account if any (e.g., an Apple account (for iPhones or other devices that use the iOS operating system), Google account (for Android cellular phones), or a Microsoft account (for a device running Windows)), country, time zone, language, and sometimes an associated credit card number.

b. In addition, in my training and experience, I know that electronic device users typically modify the "wallpaper," "home screen," or "desktop" of electronic devices soon after acquiring the devices. Second, I know in my training and experience that electronic device users often customize the "wallpaper," "home screen," or "desktop" of electronic devices with images of themselves, or other persons, places, or things that are important to the device user. Such images are typically visible every time the user accesses the electronic device and are strongly indicative of use and control.

c. The "contacts" or "address book" on an electronic device can be strongly indicative of who uses and controls the device. Such contacts are often set

up as soon as the user acquires the device (sometimes automatically by the vendor, through synchronization with an existing account, or through another process (e.g., "Airdrop" with iPhones)) and are added to incrementally over time.

54. I know that when an individual uses an electronic device to store, collect and/or download child pornography, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to engage in criminal activity of the kind described above may contain: data that is evidence of how the device was used; data that was sent or received; information as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

55. *Necessity of seizing or copying entire electronic devices*. In many cases, a thorough search of a premises for information that might be stored on electronic devices will require the physical seizure or copying of electronic devices and later off-site review consistent with the warrant. In lieu of removing electronic devices from the premises, it is sometimes possible to make a copy or forensic image of electronic devices. Forensic imaging can often take a comprehensive electronic picture of the computer's data, including hidden sectors and deleted files. Similarly, an extraction of a cell phone can often make an extensive copy of the cell phone's data. Either physical seizure of or copying data from an electronic device is often necessary (in addition to or instead of

on-site review) because these techniques help to enable the review of data stored on the electronic device and prevent the loss of the data from either accidental or intentional destruction. This is true because of the following:

a. *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed and analyzed on site in a timely manner. Analyzing evidence of how an electronic device has been used, what it has been used for, and who has used it may require considerable time, and taking that much time on premises could be inefficient or even unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to examine electronic devices with special tools and expertise, and potentially for a substantial amount of time, to obtain such evidence. Electronic devices can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and possibly unduly intrusive to attempt on site.

b. *Technical requirements.* Electronic devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of electronic devices available makes it difficult to know before a search what tools or knowledge will be required to search for evidence on electronic devices at the Premises. However, taking the

electronic device off site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. *Variety of forms of electronic media*. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site review using specialized forensic tools.

**UNLOCKING BIOMETRICALLY SECURED DEVICES**

56. I know from my training and experience, as well as from information found in publicly available materials, that some digital devices offer their users the ability to unlock the device via the use of a fingerprint, thumbprint, or facial recognition in lieu of a numeric or alphanumeric passcode or password. These features are commonly referred to as biometric authentication and their availability is dependent on the model of the device as well as the operating system on the device. If a user enables biometric authentication on a digital device, he or she can register fingerprints, or their face, to unlock that device.

57. The passcodes that would unlock any mobile devices found during the search of the Subject Premises, BRAGDON, or the Subject Vehicle are not currently known to law enforcement. Thus, it is necessary to press the fingers of BRAGDON to a suitably equipped device's sensor or hold a suitably equipped device up to BRAGDON's face, to unlock the device for the purpose of conducting the search authorized by this warrant. Attempting to unlock the relevant device(s) via biometric authentication is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of conducting the search authorized by this warrant. I therefore request that the Court authorize law enforcement officers to press BRAGDON's fingers, including thumbs, to the fingerprint sensor of any phones or

digital devices equipped with fingerprint authentication, or to hold a device equipped with facial recognition authentication up to BRAGDON's face, to unlock the device and thereby allow investigators to search the contents as authorized by this warrant.

58. Any other occupants at the Subject Premises are not suspects of the crimes under investigation. Therefore, it is imperative that law enforcement conduct preview of devices on scene during the search warrant execution so only devices with contraband and/or linked to Steven BRAGDON are seized from the Subject Premises or Subject Vehicle.

59. Thus, it may be useful to press the finger(s) of the Subject Premises' occupants/purported user of a device to any such device's fingerprint sensor or to hold the device up to their faces, if any such device is enabled with facial recognition capabilities, in an attempt to unlock the device for the purpose of executing the search authorized by this warrant and identifying which devices belong to BRAGDON. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

60. For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of the Subject Premises' occupant(s), to include Steven BRAGDON, to the sensor of any devices whose search is authorized by the requested warrant or place the devices in front of her/his face for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

## CONCLUSION

61. Based on the information provided in this affidavit, I respectfully request that the attached warrant be issued authorizing the search of: (A) the Subject Premises

located at 52 Sabattus Street, Apartment 3R (labeled with a number 6 on the door), Lewiston, Maine, (B) the person of Steven BRAGDON, (C) the Subject Vehicle known to be a 2016 Dark Blue Chevrolet Traverse, VIN: 1GNKVFKD3GJ238532, registered to BRAGDON in the state of Maine with an active Maine license plate of "525BES," as well as any cell phones, computers, computer equipment, or computer storage media and electronic storage media located during said searches for evidence, fruits, and instrumentalities relating to violations of Title 18, United States Code, Sections 2252A(a)(5)(B) and (b)(2) (possession of/access with the intent to view child pornography) (collectively the "Target Offenses"), as more fully described in Attachment B.

ATTESTED TO BY THE APPLICANT IN ACCORDANCE WITH THE REQUIREMENTS OF RULE 4.1 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE.

Respectfully submitted,

José G. Rodriguez-Aguilar
Special Agent

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Sep 23 2026

Judge's signature

City and state: Portland, Maine

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title